UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OCEAN PEACE, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES SEAFOODS, LLC, <br><br> Defendant. | CASE NO. C06-122JLR <br><br> ORDER |

## I. INTRODUCTION

This matter comes before the court on a motion for summary judgment (Dkt. # 10) from Defendant United States Seafoods, LLC ("USS"). Although Plaintiff Ocean Peace, Inc. ("OP") has requested oral argument, the court finds the instant motion appropriate for disposition on the basis of the parties' briefing and supporting evidence. For the reasons stated below, the court DENIES USS's motion.

## II. BACKGROUND

OP owns the F/T OCEAN PEACE ("OCEAN PEACE"), a fishing vessel that operates in groundfish fisheries in the Bering Sea and Gulf of Alaska. From 2003 until 2005, USS operated the OCEAN PEACE under the terms of a management agreement ("Management Agreement" or "MA") that it entered with OP in February 2003 and restated in December 2003. Doherty Decl. Ex. 1. USS has operated the OCEAN PEACE

ORDER – 1

under similar management agreements since 2001.  USS also manages one or more other vessels that OP does not own.

The Management Agreement designates USS as the "contractual agent" for OP. MA at 1, ¶ 1.1.[1]  Among other things, it obligates USS to "present written notice" to OP of "any and all opportunities" that USS becomes aware of for the "acquisition . . . of any rights . . . in any fisheries in which the [OCEAN PEACE] is engaged, or may be reasonably outfitted to engage which become known to [USS] during the term of" the agreement.  MA at 12-13, ¶ 17.2 ("Clause 17.2").

In early 2004, OP and USS entered a separate agreement covering processing of fish allocated to four Alaskan non-profit groups under government programs establishing Community Development Quotas ("CDQs") for groundfish resources.  USS had processed fish for these groups aboard the OCEAN PEACE and other vessels since at least late 2002.  The 2004 agreement ("CDQ Side Agreement" or "SA") was the first written agreement between USS and OP regarding CDQ fish processing.  The CDQ Side Agreement expressly does not "supercede [sic] the Management Agreement." SA at 4, ¶ 10.4.

On September 27, 2005, USS gave OP notice that it was terminating the Management Agreement effective November 15, 2005.  Since then, several OCEAN PEACE crew members have left the vessel to work on another vessel under USS management.  In addition, OP alleges that USS has entered into new agreements with CDQ groups for 2006 and beyond.

In this action, OP claims that USS breached its duties under the Management Agreement as well as its fiduciary duties by not disclosing new fishing opportunities and

---

[1] The court's citations to the Management Agreement refer to the "Amended and Restated Management Agreement" found in Exhibit 1 to the Declaration of Matthew Doherty.

ORDER – 2

by engaging in conduct (including the solicitation of OP employees) designed to undermine OP's ability to operate the OCEAN PEACE without USS management. USS moves for summary judgment against all claims.

## III. ANALYSIS

On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). When confronted with purely legal questions, the court does not defer to the non-moving party.

**A.   USS is Not Entitled to Summary Judgment on OP's Contract Claims.**

The court turns first to OP's contract claim, which requires the court to consider the interpretation of the parties' agreements and the interplay between them. In Washington,[2] contract interpretation is a question of law. Tanner Elec. Coop. v. Puget Sound Power & Light, 911 P.2d 1301, 1310 (Wash. 1996). Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic inference admits more than

---

[2] The parties agree that Washington law governs the interpretation of both the Management Agreement and the CDQ Side Agreement. See MA at 10, ¶ 11.1 (designating Washington law to govern in the absence of applicable maritime law); SA at 3, ¶ 10.1 (designating Washington law).

ORDER – 3

one "reasonable inference," the court cannot interpret the contract as a purely legal matter. Id. These limitations, which arose from the decision in Berg v. Hudesman, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation. Hearst Comms., Inc. v. Seattle Times Co., 115 P.3d 262, 266 (Wash. 2005). In Hearst, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'" Id. at 267 (quoting Hollis v. Garwall, Inc., 974 P.2d 836, 843 (Wash. 1999)) (emphasis in Hearst). Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Id. (directing courts to interpret "what was written" rather than "what was intended to be written").

### 1. Clause 17.2 of the Management Agreement Requires USS to Disclose CDQ Opportunities to OP.

With these principles in mind, the court turns first to the Management Agreement. As noted above, Clause 17.2 requires USS to "present written notice" to OP of "any and all opportunities that [USS] becomes aware of for the acquisition . . . of any rights . . . in any fisheries in which the [OCEAN PEACE] is engaged, or may be reasonably outfitted to engage . . . ." This requirement applies to any opportunity that "become[s] known to [USS] during the term of this agreement."

There is no dispute that, in the absence of the CDQ Side Agreement, the plain meaning of Clause 17.2 would have required USS to notify OP of any new CDQ opportunities that arose during the term of the Management Agreement. USS offers no contrary interpretation, and the court finds no support for one in the text of the contract.

ORDER – 4

**2.  The CDQ Side Agreement Does Not Relieve USS of Its Obligation to Disclose CDQ Opportunities to OP.**

To avoid Clause 17.2, USS contends that it does not apply to CDQ opportunities because the CDQ Side Agreement modifies the Management Agreement in that respect. To support its contention, USS relies on the integration clause in the CDQ Side Agreement:

> This CDQ Side Agreement contains the entire agreement between the parties concerning the treatment of OP's CDQ opportunities under USSF management.  This CDQ Side Agreement does not, however, supercede [sic] the Management Agreement.[3]

SA at 4, ¶ 10.3.  USS reads this clause to eliminate its obligations under Clause 17.2 as to any CDQ opportunities.

USS reads the integration clause too broadly.  By its terms, it does not apply to all CDQ opportunities, but rather only to "OP's CDQ opportunities under USSF management."  Id. (emphasis added).  This phrase, whether interpreted in isolation or in the context of remainder of the CDQ Side Agreement, does not relieve USS of its obligation to disclose CDQ opportunities.[4]

In considering the context of the integration clause, the court notes that the CDQ Side Agreement as a whole applies not to CDQ opportunities generally, but rather to the

---

[3]That the CDQ Side Agreement does not supersede the Management Agreement is not dispositive.  The plain intent of the CDQ Side Agreement is to modify the Management Agreement to govern certain CDQ opportunities.  The court therefore concludes that the prohibition on superseding the Management Agreement does not prevent the Side Agreement from modifying it.

[4]In accordance with Hearst, the court has examined the limited extrinsic evidence on the record, and finds that it does not affect the court's interpretation of either the Management Agreement or the CDQ Side Agreement.

ORDER – 5

opportunity to process the "CDQ Quota" for four[5] specific "CDQ Groups." SA at 1, ¶¶ A-E. The agreement guarantees OP an "equitable opportunity to harvest the CDQ Quota relative to" other vessels that USS owns. SA at 1-2, ¶ 1. Although OP agreed to a non-competition provision that would have prevented it from pursuing CDQ opportunities after terminating the Side Agreement, the provision applied solely to "any CDQ opportunity involving . . . those CDQ Groups under contract with USSF at the time of termination." SA at 2-3, ¶ 6. The contract limits the term "CDQ Groups" to the four groups making up the CDQ Quota. SA at 1, ¶ B. In this context, the court cannot reasonably interpret the integration clause, which by its text applies to "OP's CDQ opportunities under USSF management," to apply to all CDQ opportunities.

First, the integration clause does not apply to CDQ opportunities arising from any entity other than the four "CDQ Groups." At the time USS became aware of such an opportunity, and OP was not aware of it, it would have been unreasonable to consider it "OP's CDQ opportunity." Moreover, it is not, at that point, a CDQ opportunity "under USSF management." Thus, if USS became aware of a CDQ opportunity arising from an entity other than the four CDQ groups, the opportunity was not within the scope of the integration clause. In that event, Clause 17.2 of the Management Agreement would have governed USS's responsibilities.

Second, the integration clause does not abrogate USS's responsibility to inform OP about opportunities arising from the four CDQ groups. The CDQ Side Agreement applies to the "CDQ Quota," which is defined as the "CDQ Groups' Other Trawl Groundfish Quota." SA at 1, ¶ C. Assuming that the CDQ Quota refers only to the quota under USS's existing agreement with the CDQ Groups, then any expansion of the existing

---

[5]The parties have redacted the names of the CDQ Groups from the CDQ Side Agreement. Both parties concur, however, that there were four such groups.

ORDER – 6

agreement, or any new agreement with the CDQ Groups, would not be one of "OP's CDQ opportunities under USSF management." It would therefore be beyond the scope of the Side Agreement and its integration clause, and Clause 17.2 of the Management Agreement would apply. If, on the other hand, the CDQ Quota refers to any opportunity to process fish from one of the four CDQ groups, then the Side Agreement itself obligates USSF to "provide the OCEAN PEACE with an equitable opportunity to harvest the CDQ Quota . . . ." SA at 1, ¶ 1.

Accepting OP's allegations as true, USS breached either the Management Agreement or the CDQ Side Agreement. According to OP, before the Management Agreement terminated, USS negotiated a new "agreement or set of agreements with certain CDQ groups (possibly including the groups that were parties to the 2002 Royalty Agreement and additional groups as well) . . . ." Runyon Decl. ¶ 19. Because USS did not disclose these new opportunities to OP, it breached one of the contracts.

The court's interpretation of the Management Agreement and the Side Agreement makes it unnecessary to address OP's contention that USS fraudulently induced it to enter the Side Agreement, or its contention that the parties' July 5, 2005 amendment to the Management Agreement superseded the Side Agreement.

**B.    The Court Cannot Yet Determine If USS Breached Fiduciary Duties to OP.**

OP claims that in addition to breaching its contractual obligations, USS breached its fiduciary duties as OP's agent. USS argues that the agreements between the parties, not common law, define the scope of its obligations.

The court finds that the record before it does not permit it to assess the scope of USS's fiduciary duties. Courts have "historically considered" the relationship between principal and agent to be fiduciary. Liebergesell v. Evans, 613 P.2d 1170, 1176 (Wash. 1980) (quoting McCutcheon v. Brownfield, 467 P.2d 868, 874 (Wash. Ct. App. 1970));

ORDER – 7

see also <u>Estes v. Lloyd Hammerstad, Inc.</u>, 503 P.2d 1149, 1152 (Wash. Ct. App. 1972) ("It is generally recognized that an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency."). Although common law establishes the scope of an agent's fiduciary duties as a default, those duties are subject to modification by agreement. For example, an agent and principal may agree to modify the agent's duty to disclose interests adverse to her principal. <u>Cogan v. Kidder, Mathews & Segner</u>, 648 P.2d 875, 878 (Wash. 1980) (citing RESTATEMENT (SECOND) OF AGENCY § 381). Similarly, the agent and principal may contract around the agent's duty not to compete with her principal on matters within the scope of the agency. <u>Kieburtz & Assocs. v. Rehn</u>, 842 P.2d 985, 988 (Wash. Ct. App. 1992) (citing RESTATEMENT (SECOND) OF AGENCY § 393).

Where a contract governs an agency relationship, the terms of the contract control. <u>Thomle v. Soundview Pulp Co.</u>, 42 P.2d 19, 28 (Wash. 1935). The court must also, however, consider the possibility that the parties broadened the agent's duties beyond those expressed in the contract.[6] <u>Id.</u> Indeed, the court cannot determine the scope of an agent's fiduciary obligation without considering the facts surrounding her relationship with her principal. <u>Id.</u>; <u>see also</u> <u>Liebergesell</u>, 613 P.2d at 1176.

On this record, the court cannot assess whether USS's fiduciary duties are broader than its contractual obligations. This action is still in its early stages. Discovery will not close for six months. The record consists of the agreements between the parties and

---

[6] USS contends that when the parties agreed that their relationship was "purely contractual," MA at 1, ¶ 1.1, they foreclosed the possibility of fiduciary duties broader than those contained in the contract. Although this clause is relevant to the scope of the parties' relationship, it does not excuse the court from considering whether the parties expanded USS's duties through their conduct after entering the Management Agreement.

ORDER – 8

declarations from the principals of USS and OP. On this evidence, the court cannot determine the scope of USS's fiduciary duties, or whether it breached them.

For the same reason, the court declines to address OP's claims to the extent they arise from USS's solicitation of OCEAN PEACE crew members. On this record, it is not clear whether OP brings these claims in tort or in contract. In either case, the court concludes that OP could, through discovery, adduce facts to support these claims.

Finally, the court declines to decide whether the "economic loss rule" on which USS relies applies in this action. When it applies, the economic loss rule is a limitation on a party's ability to recover economic damages in tort. See Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1, 881 P.2d 986, 989-992 (Wash. 1994). At this stage, OP has a viable contract claim for economic damages. The court need not discuss whether the economic loss rule would limit OP's ability to recover those damages or other economic damages through its claim for breach of fiduciary duty.

## IV. CONCLUSION

For the reasons stated above, the court DENIES USS's motion (Dkt. # 10).

Dated this 28th day of June, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 9